**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

George Wilson Overturf,

           Plaintiff,

v.

Charles L. Ryan, et al.,

           Defendants.

No.  CV 15-02301-PHX-GMS (BSB)

**ORDER**

Plaintiff George Wilson Overturf, who is currently confined in the Arizona State Prison Complex (ASPC)-Florence, brought this civil rights action pursuant to 42 U.S.C. § 1983.  Plaintiff filed a "Dispositive Motion" (Doc. 185), in which he appears to seek summary judgment, and Defendant Fox and Defendants McGarry, Maranzano, Ryan, Pratt, and Pereira responded and moved or cross moved for summary judgment. (Docs. 191, 204.)  Plaintiff was informed of his rights and obligations to respond to Defendants' Motions for Summary Judgment pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc) (Doc. 193, 209), and he opposes both Motions. (Doc. 198, 225.)[1]

---

[1] In light of the confusion created by Plaintiff's Dispositive Motion, the Clerk of Court docketed Plaintiff's Response to Defendants McGarry, Maranzano, Ryan, Pratt, and Pereira's Cross Motion for Summary Judgment as both a Reply (Doc. 225) and a Cross Motion for Summary Judgment (Doc. 226).  Upon review of these documents, the Court construes Doc. 225 as a Response and will strike Doc. 226 as a duplicate filing.

The Court will deny Plaintiff's Dispositive Motion and will grant Defendant Fox's and Defendants McGarry, Maranzano, Ryan, Pratt, and Pereira's Motions for Summary Judgment.

## I. Background

On screening of the one-count Complaint under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated claims for denial of constitutionally adequate medical care for his alleged eye conditions against Defendants Nurse Practitioners (NPs) Deborah McGarry and Nicole Maranzano and RN J. Fox and dismissed the remaining Defendants. (Doc. 6.) Plaintiff subsequently amended the Complaint to add additional allegations against Arizona Department of Corrections (ADC) Director Charles L. Ryan, ADC Assistant Director of the Health Services Contract Monitoring Bureau Richard Pratt, and ADC Facility Contract Health Services Administrator Christine Pereira (Doc. 79 (First Amended Complaint or FAC)), and the Court found that he stated claims against these Defendants based on their alleged ability to review and override the actions of prison healthcare providers. (Doc. 93.)

## II. Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit

under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

## III. Facts

The following facts are taken from Defendant Fox's Statement of Facts (Doc. 192), Plaintiff's Statement of Facts in Response to Defendant Fox's Statement of Facts (Doc. 199), Defendants McGarry, Maranzano, Ryan, Pratt, and Pereira's (hereinafter "McGarry Defendants" or "Defendants") Statement of Undisputed Material Facts (Doc. 205), and Plaintiff's Statement of Facts in Response to McGarry Defendants' Statement of Undisputed Material Facts (Doc. 223).[2]

### A. Plaintiff's Eye Conditions and Treatment

Plaintiff has a history of cataracts—a clouding of the lenses of the eyes—and he suffers from AMD—an incurable condition characterized by deterioration of the central

---

[2] Plaintiff did not file a separate statement of facts with his Dispositive Motion, as required by Local Rule of Civil Procedure 56.1. Instead, he included within the body of that Motion several pages of unnumbered paragraphs, many of which include Bates number references to his medical records but no supporting attachments. (Doc. 185 at 2–6.)

part of the retina, the inside back layer of the eye.  (Doc. 192 ¶ 2; Doc. 205 ¶¶ 2, 5.)

AMD usually produces slow, painless vision loss over the course of many years or decades and is diagnosed in three stages: early, intermediate, and late AMD, which involves noticeable vision loss.  (Doc. 205 ¶ 2; Doc. 205-4, Ex. C (Hartzell Decl.) ¶ 6.) There is currently no treatment for early AMD, but some research shows that the risk of vision loss from AMD may be lessened through a diet that includes fruits and vegetables rich in lutein and zeaxanthin and through lutein supplements.  (Hartzell Dec. ¶ 6; Doc. 223 ¶ 1(a); Doc. 140-5 at 28−32.)[3]

The Age-Related Eye Disease Study (AREDS)—a clinical trial that investigated the history and risk factors associated with AMD and cataracts—concluded that individuals with intermediate AMD in both eyes or with intermediate AMD in one eye and advanced AMD in the other eye may benefit from certain supplements, but these supplements did not have a significant effect on the development and progression of cataracts.  (Hartzell Decl. ¶ 7.)  A second study, AREDS 2, also concluded that certain nutritional supplements may slow the progression of intermediate AMD or intermediate AMD with advanced AMD in one eye.  (*Id.*)  There is no evidence, however, that AREDS formulas slow the progression of early AMD.  (*Id.*)

Glaucoma is an irreversible and incurable disease in which buildup of pressure in the eye damages the optic nerve.  (Doc. 205 ¶ 4.)  Glaucoma can be treated with eye-drop medications, laser surgery, or conventional surgery, which are used to lower eye pressure. (*Id.*, Doc. 140-4 at 24−25.)  There is no evidence that vitamins can be used to treat or slow the progression of glaucoma.  (Doc. 205 ¶ 4.)

On June 25, 2014, ophthalmologist Dr. Michael Horsley evaluated Plaintiff for glaucoma.  (*Id.* ¶ 6.)  Plaintiff had 20/40 vision in his right eye and 20/20 vision in his left eye and intraocular pressure (IOP) of 17 in his right eye and 15 in his left eye (normal range is 12-22).  (*Id.*)  Dr. Horsley diagnosed Plaintiff with AMD and glaucoma and

---

[3] The citation refers to the document and page number generated by the Court's Case Management/Electronic Case Filing system.

noted he had good IOP.  (*Id.*)  He instructed Plaintiff to continue taking Timolol and ocular vitamins and/or multivitamins as directed and to monitor for vision changes.  (*Id.*)

On January 6, 2015, Defendant NP McGarry reviewed Plaintiff's chart in response to Plaintiff's request to renew his prescription for Ocuvite with Lutein.  (*Id.* ¶ 7.) McGarry noted that Plaintiff had been diagnosed with AMD and glaucoma and was due for an eye dilation examination to evaluate his AMD.  (*Id.*)  She renewed Plaintiff's prescription for two tablets of Ocuvite with Lutein daily and requested an off-site ophthalmology examination for Plaintiff's AMD. (*Id.*)

On February 24, 2015, McGarry saw Plaintiff for a chronic care visit during which she evaluated him for glaucoma, AMD, and hypertension and reviewed the results of his colonoscopy.  (*Id.* ¶ 8.)  She noted that Plaintiff was taking Timolol for his glaucoma and his eye pressure was within normal limits, and she reduced his Ocuvite with Lutein prescription to one tablet daily based on her finding that this was the manufacture recommended dosage and her belief that this dosage was sufficient to treat Plaintiff's eye conditions, which were mild and stable.  (*Id.* ¶¶ 8−9.)  McGarry did not see Plaintiff again after this visit.  (*Id.* ¶ 10.)

On March 5, 2015, Plaintiff submitted a grievance in which he complained about the reduction of his Ocuvite with Lutein to only one tablet a day and requested a return to his original dosage.  (*See* Doc. 205-2 at 1.)[4]

On April 6, 2015, outside ophthalmologist Dr. Daniel Adelberg of the Southwestern Eye Center saw Plaintiff to evaluate his AMD.  (Doc. 205 ¶ 11; Doc. 205-1 at 115−17.)  Plaintiff had 20/30 vision in his right eye, 20/20 vision in his left eye, and his IOP in both eyes was 20, which is within normal limits.  (Doc. 205-1 at 115;

---

[4] Plaintiff claims he made multiple complaints, including that his eye conditions worsened due to McCarrey's change in his medication dosage, but his references to documents without specific page numbers or to Bates numbers that do not correspond to any readily-identifiable attachments make it difficult and time-consuming for the Court to substantiate his claims.  (*See* Doc. 223 ¶¶ 8−9.)  Here, the Court has relied on Defendants' attachments to substantiate that Plaintiff submitted at least one grievance about McCarrey's decrease in his dose of Ocuvite with Lutein.

Doc. 205-1, Ex. A (Maranzano-Lyons Decl.) ¶ 13.) Dr. Adelberg noted that Plaintiff's conditions were stable and his vision unaffected. (Doc. 205-1 at 117.) He discussed his diagnoses in detail with Plaintiff, noted that no treatment was required at that time, and recommended that Plaintiff use AREDS 2 formula and quality sunglasses and follow up in one year. (*Id.*)

Also on April 6, 2015, Plaintiff's prescription for multivitamins expired. (Doc. 205 ¶ 12.) On April 8, 2015, Defendant NP Maranzano renewed this prescription but later cancelled it because she had overlooked that Plaintiff was already receiving Ocuvite with Lutein, which she concluded was sufficient for his AMD. (*Id.*)

On April 24, 2015, a nurse saw Plaintiff for a request for multivitamins and informed him he could purchase these from the commissary, and Plaintiff became hostile and was asked to leave the medical unit. (*Id.* ¶ 13.)

On June 4, 2015, Maranzano renewed Plaintiff's prescriptions for Timolol, artificial tears, ferrous gluconate, vitamin B, and Ocuvite with Lutein. (*Id.* ¶ 14.) On June 8, 2015, she saw Plaintiff for his complaints about his medications and, to address his concerns, she increased his Ocuvite with Lutein to two tablets daily. (*Id.*; Maranzano-Lyons Decl. ¶¶ 16−17.)

On August 24, 2015, Plaintiff filed a Health Needs Request (HNR) regarding toenail fungus on his left big toe, which he noted was his third HNR for the same issue, and Defendant RN Jennifer Fox responded that he was already scheduled to see a healthcare provider in September. (Doc. 199 ¶ 8; Doc. 192 ¶ 11; Doc. 37-2 at 18.)[5]

---

[5] Despite searching the various documents in this action containing Plaintiff's medical records, the Court was unable to locate any prior HNRs about this issue or any but one of the "many" other HNRs Plaintiff claims Fox answered between August 24 and September 30, 2015. (*See* Doc. 192 ¶ 8; Doc. 205-1 at 135.) Here, as elsewhere throughout Plaintiff's facts, Plaintiff references only a list of Bates numbers and fails to cite to the document numbers where the specific medical record evidence can be found, making it difficult to substantiate his factual assertions.

On August 25, 2015, Plaintiff filed another HNR requesting an Ocuvite refill and to see an eye doctor, and Fox responded that he would get his second card of pills when he used the first one up, and she referred him to the eye line. (Doc. 37-2 at 19.)

On August 31, 2015, Fox saw Plaintiff for his complaints that the lack of multivitamins was causing him to lose his vision and that his left great toenail was infected. (Doc. 205 ¶ 15; Doc. 205-1 at 90.) Fox had Plaintiff look at a Snellen/Bernell eyechart, from which she determined he had 20/25 vision, and she noted that his left great toe was a little red and the toenail a little yellow, but Plaintiff had no extrudage, drainage, or pain on palpation. (Doc. 205-1 at 92−93.)[6] According to Fox, Plaintiff's toenail fungus was not a serious medical issue but was cosmetic in nature and did not require medical treatment. (Doc. 192-1 (Fox. Decl.) ¶¶ 2−4.) Fox also found that Plaintiff had no eye abnormalities, but noted he was "very loud and argumentative" and "fearful of going blind." (*Id.*) She told Plaintiff that he was already receiving iron, B vitamins, and Ocuvite daily, and she would schedule him to see a medical provider for a referral back to the Southwestern Eye Clinic as had been recommended. (*Id.*) Plaintiff told Fox that he had a letter from a VA doctor in his medical file stating that the VA would be glad to treat Plaintiff and send medication for him. (Doc. 79 at 16 § 3.12.) According to Plaintiff, Fox told him she would check on this. (*Id.*)

On September 15, 2015, Plaintiff filed another HNR seeking medication renewals and to see a provider, and Fox responded that his medications were still good until October 6 or 10 and referred him to a provider. (Doc. 192 ¶ 13; Doc. 37-2 at 25.)[7]

---

[6] Plaintiff claims to dispute these facts, but he states only that the Snellen eye chart Fox used to determine his vision is obsolete. (Doc. 223 ¶ 15.) The Court was unable to locate any evidence in Plaintiff's citations to support this proposition.

[7] Plaintiff claims that he filed two previous HNRs about the same issue on August 10 and August 17, 2015, and Fox failed to send him to a provider until September 15, 2015 (Doc. 199 ¶ 11), but the two documents he cites are the August 24, 2015 HNR he filed about his toenail, and the August 25, 2015 HNR he filed regarding his pill refills, both of which Fox addressed. (*See* Doc. 199 at 13−14.)

Maranzano saw Plaintiff to discuss his vitamin prescriptions, and Plaintiff reported pain in his right eye and complained of deteriorating vision and inability to read, which he attributed to the discontinuation of his multivitamins. (Doc. 205 ¶ 16.) Maranzano noted that Plaintiff's visual acuity findings had improved from the results of his April 2015 ophthalmologic exam, and she had an extensive discussion with Plaintiff regarding treatment for his AMD. (*Id.*) She explained that the AREDS 2 study showed that the progression of AMD could be slowed with ocular vitamins such as vitamins C and E, Zinc, and Lutein, which were available in Ocuvite with Lutein, and Plaintiff had been prescribed sufficient ocular vitamins. (*Id.*) With regard to Plaintiff's complaints of eye pain, Maranzano submitted a request for an ophthalmology exam to assess his glaucoma—which was subsequently scheduled for January 6, 2016—and she renewed his special needs request for sunglasses. (*Id.*)[8]

On September 28, 2015, Maranzano saw Plaintiff for a chronic care visit for hypertension. (*Id.* ¶ 17.) Plaintiff stated he was going blind and claimed that he was not being given a 5 to 1 ratio of Lutein and Zeaxanthin as recommended by the AREDS 2 study. (*Id.*; Doc. 140-5 at 19.) Maranzano again discussed the AREDS 2 study with Plaintiff and stated that his Ocuvite with Lutein does have a 5 to 1 ratio of Lutein to Zeaxanthin, he was getting the recommended treatment for his conditions, and his visual acuity had not decreased since his April 2015 exam. (Doc. 140-5 at 19.) Plaintiff continued to claim he was going blind due his lack of multivitamins, and he became argumentative and had to be escorted out. (*Id.*)

---

[8] Plaintiff claims to dispute the accuracy of Maranzano's medical opinions and actions. (Doc. 223 ¶¶ 15−17.) Here, and elsewhere throughout his Statement of Facts, Plaintiff relies on general references to a number of articles from the National Eye Institute (NEI) and the American Macular Degeneration Foundation (AMDF) regarding glaucoma, cataracts, AMD, and the AREDS studies. (Doc. 223 ¶¶ 1, 2, 16; Doc. 140-4 at 23−29; Doc. 140-5 at 1, 22−27, 28−33.) To the extent these articles contain additional relevant information about these conditions and studies to that contained in Defendants' facts and supporting evidence, the Court has already incorporated this information. Plaintiff does not cite to, and the Court has not found, any evidence that specifically contradicts Maranzano's medical opinions or treatment.

On January 6, 2016, Dr. Horsley saw Plaintiff for a glaucoma and cataract evaluation, at which time Plaintiff complained of decreasing vision and difficulty reading. (Doc. 205 ¶ 19.) Plaintiff had 20/40 vision in his right eye and 20/25 vision in his left eye, and Dr. Horsley assessed him as having mild stable open-angle glaucoma, mild AMD in his right eye, and reasonable IOP in both eyes. (*Id.*; Doc. 205-1 at 127, 130.) He ordered that Plaintiff continue taking Timolol and AREDS vitamins and have a dilation in 12 months but opined that he did not require other treatment. (Doc. 205-1 at 130.) He noted that "use of vitamins has shown to improve the effects of ARMD." (*Id.*) Maranzano reviewed Dr. Horsley's notes on January 11, 2016. (Doc. 205 ¶ 20.)

On February 2, 2016, Plaintiff requested renewal of his multivitamin prescription, and Maranzano informed him that he was already receiving the proper ocular vitamins. (*Id.* ¶ 21.)

On March 21, 2016, Maranzano saw Plaintiff in chronic care for hypertension and noted that Dr. Horsley had seen Plaintiff for glaucoma in January 2016, but Plaintiff needed a follow-up appointment with Dr. Adelberg for his AMD. (*Id.* ¶ 22.) She ordered a continuation of Plaintiff's vitamins and Timolol and requested an appointment with Dr. Adelberg. (*Id.*) Maranzano was not involved in scheduling this appointment. (Maranzano-Lyons Decl. ¶ 30.)

On April 29, 2016, Dr. Robert Barker saw Plaintiff for follow up to a colonoscopy, at which point he noted Plaintiff was due for an eye re-check and requested a routine off-site ophthalmology consult. (Doc. 205-1 at 153, 157.)

On November 8, 2016, Dr. Warren Heller saw Plaintiff for his glaucoma and AMD. (Doc. 205 ¶ 24.) Plaintiff had 20/50 vision in his right eye, 20/20 vision in his left eye, and 15 IOC in each eye. (*Id.*) Plaintiff told Dr. Heller he had been taking Timolol, Ocuvite, and multivitamins, but "they stopped his multivitamins without giving him a reason." (Doc. 205-1 at 235.) Dr. Heller diagnosed Plaintiff with open angle glaucoma and mild AMD and recommended he be on Ocuvite, a multivitamin, and

Timolol and be seen again in three months. (*Id.*)[9] Upon Plaintiff's return to ADC, Dr. Glen Babich ordered Ocuvite, multivitamins, and Timolol for Plaintiff. (Hartzell Decl. ¶ 16.)

According to board-certified ophthalmologist Dr. Scott Hartzell, visual acuity may vary on a day-to-day basis, and the variation in Plaintiff's right eye vision at each appointment does not indicate the progression of his AMD, glaucoma, or cataracts, which have remained stable and unchanged. (Hartzell Decl. ¶ 17.) Upon review of Plaintiff's medical records, Dr. Hartzell found that Plaintiff has been diagnosed with mild or early AMD, and he opines that Plaintiff received appropriate treatment and medications, the ocular vitamins he received were sufficient and comparable to those recommended in the AREDS 2 trials, and Plaintiff did not suffer any injury or harm from not receiving additional vitamins. (*Id.* ¶¶ 8, 19.) Further, there is no scientific evidence that the AREDS formulas and nutritional supplements, which were found only to slow the progression of AMD in individuals with intermediate AMD or late AMD in only one eye, are effective at slowing the progression of early AMD. (*Id.* ¶ 7.)

## B. ADC Defendants

Christina Pereira was the Associate Facility Health Administrator (AFHA) between May 2013 and May 2015 and the Facility Health Administrator (FHA) at ASPC-Florence between May 2015 and June 2016. (Doc. 205 ¶ 31.) As the AFHA, she responded to inmate grievances, but she no longer did so after her promotion to FHA. (*Id.* ¶ 32.) Pereira did not provide medical treatment to inmates, and she had no role in prescribing, reviewing, or approving Plaintiff's medications. (*Id.* ¶¶ 32−33.) She also had no role in formulating or implementing policies regarding the medical treatment of inmates. (*Id.* ¶ 34.) Pereira's only involvement with Plaintiff was in responding to medical grievances Plaintiff submitted on March 5 and April 2, 2015, regarding the

---

[9] Plaintiff claims that he told Dr. Heller that his eyes hurt and got tired; this information does not appear, however, in Dr. Heller's notes from that visit. (Doc. 223 ¶ 24.)

reduction of his Ocuvite with Lutein prescription from two tablets to one tablet per day and the discontinuation of his multivitamins. (*Id.* ¶¶ 35−37.)

In response to these two grievances, Pereira reviewed Plaintiff's medical records and consulted with Plaintiff's providers and with Site Medical Director Dr. Chris Johnson to ensure that Plaintiff was receiving appropriate medical care. (*Id.* ¶¶ 36−37.) Pereira informed Plaintiff that his medical providers stated that one tablet of Ocuvite with Lutein was appropriate for his condition. (*Id.*) Dr. Johnson further confirmed that Plaintiff's prescriptions were appropriate. (*Id.*)

Richard Pratt has been the Assistant Director of the Health Services Contract Monitoring Bureau since August 2014. (*Id.* ¶ 42.) As such, Pratt supervises a team of ADC employees who monitor contracted healthcare providers to ensure compliance with the terms of their contracts with ADC. (*Id.* ¶ 43.) No one in the Contract Monitoring Bureau, including Pratt, assists in providing medical care to inmates. (*Id.*) Pratt has also never created policies regarding the treatment of inmates for AMD, glaucoma, or cataracts and is not aware of any policy that prioritizes cost saving measures over providing timely and adequate medical care to inmates. (*Id.* ¶ 48.)

Pratt serves as Director Ryan's designee in reviewing and responding to inmate medical grievance appeals, which are first reviewed by a Grievance Appeal Investigator who drafts a response based on his or her investigation. (*Id.* ¶¶ 44−45.) Clinical decisions regarding healthcare services to inmates are the sole responsibility of the qualified healthcare professionals. (*Id.* ¶ 47.) Pratt's designee, Deputy Director Jeffrey Hood, reviewed and signed Plaintiff's grievance appeals concerning his requests to renew his multivitamins and increase his dosage of Ocuvite with Lutein, and Pratt was not aware of these appeals. (*Id.* ¶¶ 51−52.) Based on Pratt's review of the appeal responses, Pratt believes Plaintiff's concerns about his eye health were appropriately addressed by the onsite healthcare providers. (*Id.* ¶ 53.)

Charles Ryan is the Director of the ADC and is authorized to contract for assistance in providing healthcare services to inmates. (*Id.* ¶ 54.) Ryan is not a licensed

medical professional and does not create medical policy, and decisions about proper medical treatment for inmates are the sole responsibility of the qualified healthcare professionals. (*Id.* ¶ 55.) Per ADC policy, the Grievance Appeals Investigator drafts responses to any medical grievance appeals at the Director's level, and the Deputy Director or other designee signs them on Ryan's behalf. (*Id.* ¶ 57.) Ryan had no personal involvement with Plaintiff or his medical care. (*Id.* ¶ 56.)

## IV. Plaintiff's Dispositive Motion

As noted, Plaintiff did not provide a separate statement of facts or point to any readily identifiable evidentiary support for his Dispositive Motion. Plaintiff also does not request or set forth a legal basis for granting summary judgment on his claims; instead, he states only that he believes "the jury will grant" his requests for relief in the FAC. (Doc. 185 at 7.) Because it is not clear what action Plaintiff seeks from the Court or that he is entitled to any relief at this stage of the proceedings, the Court will summarily deny Plaintiff's Dispositive Motion and will only discuss the other pending motions.[10]

## V. Defendant Fox's Motion for Summary Judgment

### A. Eighth Amendment Standard

Not every claim by a prisoner relating to inadequate medical treatment states a violation of the Eighth Amendment. To state a § 1983 medical claim, a plaintiff must show (1) a "serious medical need" by demonstrating that failure to treat the condition could result in further significant injury or the unnecessary and wanton infliction of pain and (2) the defendant's response was deliberately indifferent. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).

"Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). To act with deliberate indifference, a prison official must

---

[10] Plaintiff appears to believe, based on the Court's scheduling orders, that he was required to file a dispositive motion before this case could to go to trial. A dispositive motion, such as a motion for summary judgment, is a way to end a case without it having to go to trial. Unless a case is resolved on summary judgement or is otherwise dismissed, it will proceed to trial as a matter of course.

both know of and disregard an excessive risk to inmate health; "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Deliberate indifference in the medical context may be shown by a purposeful act or failure to respond to a prisoner's pain or possible medical need and harm caused by the indifference. *Jett*, 439 F.3d at 1096. Deliberate indifference may also be shown when a prison official intentionally denies, delays, or interferes with medical treatment or by the way prison doctors respond to the prisoner's medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976); *Jett*, 439 F.3d at 1096.

Deliberate indifference is a higher standard than negligence or lack of ordinary due care for the prisoner's safety. *Farmer*, 511 U.S. at 835. "Neither negligence nor gross negligence will constitute deliberate indifference." *Clement v. California Dep't of Corr.*, 220 F. Supp. 2d 1098, 1105 (N.D. Cal. 2002); *see also Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) (mere claims of "indifference," "negligence," or "medical malpractice" do not support a claim under § 1983). "A difference of opinion does not amount to deliberate indifference to [a plaintiff's] serious medical needs." *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). A mere delay in medical care, without more, is insufficient to state a claim against prison officials for deliberate indifference. *See Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985). The indifference must be substantial. The action must rise to a level of "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 105.

## B. Discussion

Defendant Fox argues that she is entitled to summary judgment because she was not deliberately indifferent to Plaintiff's requests for ocular vitamins or his alleged foot fungus and Plaintiff cannot show that he suffered any harm. (Doc. 191 at 5−9.)

Plaintiff alleges in the FAC that Fox violated his Eighth Amendment rights "by denying access to medical providers Maranzano and McGarry; or forwarding HNRs to McGarry or Maranzano." (Doc. 79 at 20 § 3.27.) His claim also appears to rest on

allegations that Fox did not provide him multivitamins or treat his foot fungus when she saw him on August 31, 2015, and she failed to ensure that he receive treatment and medications from the VA Medical Center, even though he told her he had a letter from a VA doctor in his medical file stating that the VA was willing to provide him such care. (*See id.* at 15−16 § 3.12.)

With respect to Plaintiff's requests for multivitamins, Fox argues that, as an RN, she is not authorized to prescribe medications or alter provider prescriptions and therefore cannot be held liable for failing to prescribe him multivitamins. (Doc. 191 at 4−5 (citing Ariz. Admin. Code R4-19-402).) Where, as here, numerous defendants allegedly acted with deliberate indifference, the Court must take an individualized approach that accounts for the duties, discretion, and means of each defendant. *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988). The Court must look at "whether [each] individual defendant was in a position to take steps to avert the [harm], but failed to do so intentionally or with deliberate indifference." *Id.*

Here, the evidence shows that Maranzano, not Fox, cancelled Plaintiff's prescription for multivitamins because Maranzano saw that Plaintiff was already receiving Ocuvite with Lutein, which she believed was sufficient to treat his AMD. (Doc. 205 ¶ 12.) Plaintiff presents no evidence that Fox had any reason or authority to go against this decision or to prescribe multivitamins or any other medications on her own. Moreover, the evidence shows that when Fox saw Plaintiff on August 31, 2015, she told him she would refer him to a provider for follow up care. (Doc. 205-1 at 92−93.) This evidence does not support that Fox was deliberately indifferent to Plaintiff's asserted need for multivitamins.

Similarly, to the extent Plaintiff seeks to hold Fox liable for failing to refer him to the VA Medical Center, this also was not within the scope of her duties as an RN, and the evidence does not support that Plaintiff needed to go to the VA for treatment. As the Court pointed out in its initial screening order, ADC policy permits physicians or physicians assistants to refer an inmate to a local VA Medical Center for medical care if

that care is *not available* within ADC.  (Doc. 6 at 5 n.3 (citing DO 1101.11.1.3).)  Here, the evidence does not show that the care Plaintiff sought in the form of additional treatment or medications from the VA was not available within ADC; instead, it shows that Plaintiff's medical providers had determined he was already receiving all the recommended care necessary to treat his conditions.  On this record, there is no basis for finding that Fox was deliberately indifferent by not ensuring Plaintiff was sent to the VA Medical Center.

There is also no evidence that Fox failed to refer Plaintiff to Maranzano and McGarry or any other healthcare providers for any serious medical needs.  First, although Plaintiff makes repeated references in his controverting Statements of Fact and Response to the numerous HNRs he filed for his various medical issues, the Court is largely left to locate and review these HNRs on its own in an attempt to determine which of them Fox was aware of and responsible for and when, if ever, she failed to provide appropriate referrals.  Fox's Statement of Facts is similarly unhelpful.  In it, Fox primarily relies on Plaintiff's FAC to set forth the operative facts about his conditions and treatment, and, with respect to her own involvement, also relies on multiple-page citations for the Court to examine instead of setting forth a basic chronological record of Fox's HNR responses or other encounters with Plaintiff.  (*See* Doc. 192 ¶¶ 8−10.)  Despite these failings, however, the available evidence on the record is sufficient to show that Fox repeatedly responded to Plaintiff's HNRs and in-person complaints concerning his medication refills and eyesight and toenail concerns, and she referred him to the eye line or other providers for medical care.  Plaintiff fails to produce or point to any contrary evidence to create a genuine issue of material fact that Fox instead ignored his complaints or failed to refer him for proper care.

Plaintiff primarily argues, instead, that Fox violated his Eighth Amendment rights because she failed to ensure he was seen in response to his HNRs within the time-frames agreed upon in *Parsons v. Ryan*, CV 12-00601-PHX-DKD, a separate class-action lawsuit regarding inmate medical care within ADC.  (Doc. 198 at 5, 7−8, 11.)  But even if

this is so, Plaintiff's general discontent with the lengths of time he had to wait to see providers, absent specific evidence that he presented particular needs that required a more immediate response or that he suffered any harm due to Fox's failure to ensure he received more immediate care, is insufficient to show that Fox was deliberately indifferent to Plaintiff's serious medical needs. In short, a reasonable jury could not conclude on the evidence presented that Fox was deliberately indifferent to Plaintiff's serious medical needs by failing to ensure proper treatment or referrals.

Finally, to the extent that Plaintiff's claim against Fox rests on her alleged failure to treat his foot fungus, the only evidence in the record of her involvement in this issue shows that she determined Plaintiff did not have a serious medical need that required medical attention. Plaintiff fails to set forth any controverting evidence to show that he did have a serious medical need or that he was harmed as a result of Fox's failure to provide treatment.

Because the evidence shows that Fox was responsive to Plaintiff's medical issues, and Plaintiff fails to point to any evidence to create a genuine issue of material fact that she, instead, ignored or failed to treat or refer Plaintiff for treatment of any serious medical needs, or that Plaintiff was harmed as a result, the Court will grant summary judgment to Fox and dismiss her from this action with prejudice.

**V.    McGarry Defendants' Motion for Summary Judgment**

McGarry Defendants concede that Plaintiff's eye conditions constitute objectively serious medical needs, but they argue that Plaintiff did not have a serious medical need for the additional medications he claims his conditions required and Defendants did not deny, delay, or otherwise provide deficient medical care for these conditions. (Doc. 204 at 13.)

**A.    NP McGarry**

The evidence shows that on January 6, 2015, McGarry reviewed Plaintiff's chart in response to his request for renewal of his Ocuvite with Lutein, at which time she renewed his prescription for two tablets daily and requested an off-site ophthalmology

examination for Plaintiff's AMD. (Doc. 205 ¶ 7.) Subsequently, McGarry saw Plaintiff for a chronic care visit only once, on February 24, 2015, at which point she reduced his prescription for Ocuvite with Lutein to one tablet daily, based on the manufacturer's recommended dosage and her belief that this dosage was sufficient to treat Plaintiff's AMD. (*Id.* ¶¶ 8−9.) This evidence is sufficient to satisfy Defendants' initial burden of showing that McGarry responded and applied her medical judgment to Plaintiff's serious medical needs and was not deliberately indifferent to those needs.

Plaintiff does not materially dispute this evidence; instead, he argues, without medical support, that McGarry should not have reduced his Ocuvite with Lutein prescription. (Doc. 225 at 12−13.) He also cites to McGarry's statement that she was not made aware of Plaintiff's complaints about his prescription until he filed this lawsuit, but *if she had been made aware*, she would have reevaluated his chart to determine if he required two tablets of Ocuvite daily and made any necessary adjustments. (*Id.* at 13; *see* Doc. 205-4, Ex. D. (McGarry Decl.) ¶ 10.) From this, Plaintiff appears to argue that McGarry concedes he needed two tablets of Ocuvite with Lutein daily to treat his AMD, and she should not have reduced his dosage. McGarry's declaration testimony is not a concession, however, that her medical assessment was in error but only a statement that she would have revisited the issue if she had been notified of Plaintiff's complaints. Plaintiff has produced no medical evidence that taking a single tablet of Ocuvite with Lutein daily according to McGarry's reading of the manufacturer's recommendations was inadequate to treat his AMD or that his eye pain or asserted vision loss resulted from her reduction of this prescription. Plaintiff's mere difference of opinion with McGarry's dosage determination, absent any medical evidence to show it was in error, is insufficient to show McGarry acted with deliberate indifference. *Sanchez*, 891 F.2d at 242. Moreover, even if Plaintiff could show that McGarry was mistaken in her medical judgement about how much Ocuvite with Lutein Plaintiff should take, this would, at most, show she was negligent, which is insufficient to support an Eighth Amendment

claim. *See Broughton v. Cutter Labs.*, 622 F.2d at 460. Accordingly, the Court will grant summary judgment to McGarry and dismiss her from this action.

## B. NP Maranzano

Defendants argue that Maranzano was also not deliberately indifferent to Plaintiff's serious medical needs but, instead, provided "extensive and thoughtful medical treatment for Plaintiff's eye conditions." (Doc. 204 at 14.)

The evidence shows that Maranzano renewed Plaintiff's prescription for multivitamins but later cancelled it because she concluded that the Ocuvite with Lutein Plaintiff was already receiving was sufficient for his AMD; she renewed Plaintiff's Ocuvite with Lutein prescription and his Timolol prescription for his glaucoma; in order to address Plaintiff's concerns, she increased his Ocuvite with Lutein from one back to two tablets daily; she tested his visual acuity, which she determined had either improved or had not worsened since previous checks; she twice discussed his concerns about his prescriptions and the AREDS studies in detail and explained that he was already receiving the vitamins recommended in those studies from his Ocuvite with Lutein and did not require multivitamins; she twice referred him for ophthalmology exams, and she renewed his special needs request for sunglasses. (Doc. 205 ¶¶ 12, 16−17, 21−22.) This evidence is sufficient to meet Defendants initial burden of showing that Maranzano regularly responded to and was not deliberately indifferent to Plaintiff's serious medical needs.

Plaintiff's arguments to the contrary fail for many of the same reasons already discussed with respect to Defendant McGarry. As with McGarry, Plaintiff merely disagrees with Marazano's medical opinions, but he fails to point to any evidence from which a reasonable jury could conclude that Maranzano deliberately disregarded or failed to provide appropriate medical care for any known serious medical needs of Plaintiff.

Plaintiff's claim against Maranzano rests chiefly on her denial of his requests to receive multivitamins in addition to his ocular vitamins. Plaintiff summarily argues that Maranzano and his other providers "ignored all the consulting ophthalmologists" as well

as the NEI and AMDF and other findings he offered in his grievances with regard to his need for medications. (Doc. 225 at 14.) In support, Plaintiff points in wholesale fashion to his attachments of NEI and AMDF articles concerning various eye conditions and to the treatment records of the outside ophthalmologists who examined him. (*Id.*)

The outside ophthalmology records show, in relevant part, that Dr. Adelberg stated that "use of vitamins has shown to improve the effects of ARMD," and he recommended AREDS 2 formula and sunglasses (Doc. 225 at 20); Dr. Horsely recommended that Plaintiff "[c]ontinue with Timolol as directed" and "continue ocular vits/AREDS as directed and or multi-vitamins," and also noted that "use of vitamins has shown to improve the effects of ARMD" (Doc. 225-1 at 5, 12); and Dr. Heller recommended "Ocuvite medicine and a multivitamin" as well as Timolol. (*Id.* at 15.)

Although these recommendations support that vitamins may be used to treat AMD, they do not show that Plaintiff needed to take both ocular vitamins and multivitamins in order to receive appropriate medical care. At most, this evidence shows that one ophthalmologist, Dr. Heller, recommended that Plaintiff receive both Ocuvite and a multivitamin, particularly in response to Plaintiff's complaint that his multivitamins had been discontinued without explanation. (*See* Doc. 225-1 at 15.) But none of the outside ophthalmologists opined that treatment with both Ocuvite and multivitamins was the preferred medical approach or that treatment with only Ocuvite with Lutein fell below the recommended standard of care. According to Maranzano, and confirmed by Dr. Hartzell's review of Plaintiff's medical records, Plaintiff was already receiving all the medically-recommended ocular vitamins for intermediate or intermediate/advanced AMD in his Ocuvite with Lutein prescription, and he did not require additional vitamins for proper treatment. (*See* Maranzano Decl. ¶¶ 20−21; Hartzell Decl. ¶¶ 5−8, 18.) Even inferring from Dr. Heller's recommendations that Heller believed the addition of multivitamins could help slow the progression of Plaintiff's AMD, a mere difference of opinion between medical providers as to appropriate medical treatment is insufficient to show deliberate indifference. Moreover, as Dr. Hartzell notes, all of the medical

evidence on the record shows that Plaintiff had only mild or early AMD, and there is no medical evidence that vitamins are an effective treatment for early AMD or cataracts, but only for intermediate and intermediate/late stage AMD. (Harzell Decl. ¶¶ 7, 18; Doc. 140-5 at 24.) On this record, Plaintiff fails to show or create a genuine question of material fact that the treatment he received for his mild AMD and his other mild and stable eye complaints fell below the appropriate standard of care.

Plaintiff's general reliance on various articles about eye conditions and treatment options do not compel a different conclusion. As noted in the fact section above, most of the information in these sources is consistent with the opinions and treatment Plaintiff received from his providers at ADC. Plaintiff fails to point to any evidence in these or other sources from which a reasonable jury could conclude that Maranzano or any other Defendant denied him appropriate medical care for any serious medical needs. Accordingly, the Court will grant summary judgment to Maranzano and dismiss her from this action.

### C. ADC Defendants

Because Plaintiff's Eighth Amendment claims against the above medical providers fail as a matter of law, his claims against Defendants Pereira, Pratt, and Ryan for allegedly failing to exercise proper oversight over the decisions of these providers also fail. To the extent that Plaintiff also attempts to sue these individuals in their official capacities as the ones ultimately responsible for the medical policies and practices in place at ADC, Plaintiff does not allege or show that he suffered any harm as a result of any particular medical policies or practices. Accordingly, the Court will grant summary judgment to Defendants Pereira, Pratt, and Ryan and dismiss them from this action.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is **withdrawn** as to Plaintiff's Dispositive Motion, Defendant Fox's Motion for Summary Judgment, Defendants McGarry, Maranzano, Ryan, Pratt, and Pereira's Motion for Summary Judgment, and Plaintiff's Cross Motion for Summary Judgment (Docs. 185, 191, 204, 226).

(2)     Plaintiff's Dispositive Motion (Doc. 185) is **denied**.

(3)     Defendant Fox's Motion for Summary Judgment (Doc. 191) and Defendants McGarry, Maranzano, Ryan, Pratt, and Pereira's Motion for Summary Judgment (Doc. 204) are **granted**.

(4)     The Clerk of Court must **strike** Doc. 226, which was erroneously docketed as Plaintiff's Cross Motion for Summary Judgment but is a duplicate of Plaintiff's response brief filed at Doc. 225.

(5)     This action is **terminated with prejudice**.  The Clerk of Court must enter judgment accordingly.

Dated this 19th day of January, 2018.

Honorable G. Murray Snow
United States District Judge